UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LOUIS A. TERMINELLO, MICHAEL MILLER,    **ECF CASE**
PARADISE HOMEOWNERS ASSOCIATION,
HOA OF PIERMONT LANDING, REEDS &        Docket No. 08 CV 01056 (WCC)
ABBOTTSFORD GATE CONDOMINIUM,
DeVRIES POINT CONDOMINIUM, and          **AFFIDAVIT**
PARADISE HARBOR AT PIERMONT LANDING
CONDOMINIUM,

       Plaintiffs,

-against-

THE VILLAGE OF PIERMONT, NEW YORK
by its BOARD OF TRUSTEES AND TRUSTEES,
and "JOHN AND JANE DOES 1-10,"

       Defendants.
------------------------------------------------------------X

  **LOUIS A. TERMINELLO**, being duly sworn deposes and states under the penalty of perjury as follows:

  1. This Affidavit is made in opposition to the Motion to Dismiss the Complaint filed by the Plaintiffs in this matter.

  2. This Affidavit is made upon personal knowledge.

  3. For various reasons, the Motion to Dismiss the Complaint should not be granted.

## BACKGROUND

  4. As of January 1, 2004 your Deponent was a resident of and owned an interest in a condominium complex located in the Village of Piermont, New York (the "Village").

  5. In addition to being a resident in the Village for several years, I began in 2004 to become interested in Republican politics in this small Village. This Court should know that the Village political structure has strongly favored Democrats for many years. In fact, the ratio of

Democrats to Republicans in the Village is at least 3 to 1. So, being a Republican candidate in this small Democratic Village literally put a target on my back.

6. After becoming involved in Republican political matters in the Village in 2004, I soon became interested in running for the Chief Executive Officer's position in this Village which is the Mayor. This interest only made the proverbial target on my back much bigger to hit, since prior to my declared candidacy, mayoral elections in Piermont were for the most part uncontested and decided at the Democratic caucus. I was fortunate enough in the 2005 Village Election to gather almost 40% of the vote in this Democratic Village. Clearly, I was a threat to the Village Democratic power structure.

7. In addition to deciding to run as Republican for the position of Mayor in the Village, I was the President of the Piermont Landing HOA where I resided. Accordingly, I was the effective leader of a significant group of voters in the Village who were being treated unfairly for purposes of taxation by the Village.

8. Prior to July 16, 2004, I exercised the right to petition the Village Government for redress of grievances through litigation concerning the excessive real estate taxes imposed on my condominium unit, along with the other eighty-two (82) condominium owners, by the Defendant Village. The tax grievance litigation was filed in State Court challenging the improper assessments. I was the "point person" in that litigation effort. Little did I know that the powerful political forces I was confronting were now "pointing" at me and those condominium owners I represented.

9. Prior to and in 2004, condominiums in the Village were assessed using the "income approach" method, as opposed to the "sales comparison" method. The assessments were thus purportedly assessed by what income they could generate as rentals. However, in 2001, the

Village agreed we were over assessed by no less than 14% and reduced our assessments for 2001. See Board letter of March 4, 2001 annexed hereto as Exhibit "C". In 2003, the Assessor again agreed to reduce our assessments by 7% for the 2004 Town tax and the 2003 School Tax to reflect better equity with other Village properties. See Assessor's letter of February 11, 2003 annexed hereto as Exhibit "D".

10. In 2004, Scott Shedler, my real estate expert, provided us with his Report and professional opinion that we were still being over assessed under the "income approach" by almost 62% (and upon settling the tax grievance litigation in 2008, the Village years later agrees that we were over assessed by 40%), which prompted the Plaintiffs to commence the tax grievance litigation in the proper discharge my duty as Condominium Board representative with its fiduciary obligations to other condominium owners. The litigation challenged the excessive assessments.

11. On July 16, 2004 in furtherance of that litigation, a meeting was attended by me, Eric Gess, Esq. (who was the condominium attorney in that tax grievance litigation process), the Village Attorney Walter Sevastien, Esq. and the Assessor Consultant for the Defendant Village, Brian Kenney. Also present was Scott Shedler who had prepared the previously mentioned Report showing the 83 condominium units had been excessively valued for the purposes of taxation by the Village by 62%. At that meeting, Brian Kenney did _not_ dispute the Report's findings.

12. At that meeting the Assessor Consultant for the Village, Defendant's Brian Kenney, made it very clear to me and my attorney (as well as all others present) that unless I dropped the 83 tax grievances pending in Court, the Village would act in a punitive fashion against myself and all condominium owners by changing the method of taxing condominiums in the Village

3

from the "income approach" to the "sales comparison approach" method. Mr. Kenney told me that if I didn't drop the Court proceeding it "would be on my head." The Village's Assessor Consultant told me that myself and the other 82 condominium owners may "be victorious in the short run, but in the long run you will be responsible for higher taxes on all condominiums in the Village." Finally, Mr. Kenney told me as part of that punitive municipal action, "the Village is prepared to change the way they assess condominiums in the future."

13. At that July 2004 meeting, Mr. Kenney also said in closing "I want you to go back to your Board and tell them exactly what I said." Village Assessor Consultant Kenney with his threats clearly sought to interfere with my civil rights and that of the Plaintiffs to seek redress of tax grievances by litigation.

14. As Brian Kenney the Village Assessor Consultant admits in his Affidavit to this Court (which confirms the retaliation) in a Memo dated September 30, 2004 (soon after our mid-July 2004 meeting), Mr. Kenney recommended to the Defendant Village real estate tax "options" which were later confirmed to include changing the method of valuating condominium units from the existing "income approach" to the "sales comparison approach." (See, Exhibit "D" to Defendant's Motion to Dismiss). That change in tax assessment method resulted in a substantial increase in real estate taxes to many condominium owners in the Village. My unit taxes alone went up <u>87%</u> as a result of this retaliatory change in valuing condominiums in the Village.

15. This change in the method (as recommended by the Village Assessor Consultant) of valuating condominium units in the Village from an "income approach" to a "sales comparison approach" was accomplished through Article 19 of the Real Property Tax Law of New York State governing the "Homestead versus non-Homestead" taxation approach. (See, Exhibit "D" to Defendant's Motion to Dismiss).

16. While the threat was made by Mr. Kenney in July 2004 to apply a punitive tax assessment method to the 83 condominium owners in retaliation for exercising a right to grieve excessive taxes in Court, the threat was followed through promptly by the Defendants. Certainly, if the Defendant Village wanted to have a more equitable tax collection success, the Defendants could have negotiated in good faith to do so as in 2001-2003. Yet, the Defendants in 2004 did not want to negotiate in good faith about real estate taxes, but to threaten and coerce Plaintiffs to do what Defendants wanted regarding real estate taxes.

17. In unequivocal confirmation that the Village Defendants were requiring a waiver of my right and that of 82 other condominium owners to petition the Court for a redress of grievances concerning real estate taxes as a condition for not imposing a punitive condominium assessment scheme, on May 8, 2005, a second meeting was conducted at the office of the Village Attorney for the Defendants. Present were the Village Attorney and Mayor as well as the Deputy Mayor along with myself, my tax assessment attorney as well as representatives from my appraisal experts.

18. The meeting was called by my tax assessment attorney to try to resolve the pending tax certiorari litigation. In complete disregard for the purpose of the meeting, the Village Attorney, Mr. Sevastian, indicated that the Village "would only discuss a comprehensive settlement, one that involved the pending tax challenge in relation to the way the Village would tax condominiums in the future." Clearly, the Village was linking the tax certiorari litigation involving 83 condominium units in return for the Village not adopting the retaliatory and punitive method for assessing condominiums.

19. After brief consultation with my attorney and appraisal expert, the Village was advised at that meeting that the resolution of the tax challenges for 83 units should not be a

condition of not having a retaliatory and punitive method of assessing the condominium units undertaken by the Village.

20. When myself and my representatives refused to link one issue with the other, the Village representatives made it clear that they were very disappointed and there was nothing further to discuss.

21. Clearly, not only had the Village Assessor made it manifest in the July 2004 meeting that the condition for not having a retaliatory and punitive method of assessing the condominium units would be resolving all litigation involving 83 units, and the Village Mayor and Deputy Mayor confirmed the same unlawful demand in the May 2005 meeting.

22. The fact that Defendants could not accomplish this new assessment approach to condominiums (stated in mid-2004 and confirmed in May 2005) until tax bills were sent out in June 2006 was only because the required statutory steps for the Village to enact this punitive taxation assessment method took months to accomplish and could only be applied at the earliest "for the Village's 2006 roll." (See, Exhibit "D", p. 1, third paragraph of letter to assessor Brian Kenney to the Village from John Wolham of Office of Real Property Services). Thus, the Village's threats in 2004 and 2005 were implemented by the Village as soon as possible in 2006.

### OTHER FIRST AMENDMENT VIOLATIONS BY VILLAGE DEFENDANTS

23. My running for office as a Republican Mayor in a Democratic Village also brought about efforts by these same Defendants to violate my civil rights to free speech.

24. While running for Mayor in this Democratic Village, the local police department included in their patrol activities picking up my election campaign signs. Annexed hereto as Exhibit "A" is a newspaper article concerning my candidacy for Mayor as Republican and the record of my complaint about the Defendants violating First Amendment Rights.

25. Whether it was taking away my campaign signs or trying to take away my right to petition for a redress of tax grievances, this illegal pattern and practice of the Defendant Village was clear. Punishment was to be inflicted upon political rivals.

26. Whoever challenged the political status quo of the Defendant Village officials was soon found on the receiving end of bad faith conduct done for illegal reasons.

27. It bears emphasis that the retaliatory actions of the Defendant Village in changing the method of assessing condominium units in the Village was <u>directly</u> a result of my refusal to drop my tax grievance litigation and that of 82 other condominium unit owners in the Village. This has a chilling effect since I have not filed any tax certiorari litigation since the last threat in 2005. The chilling effect on the right to petition in Court concerning real property assessments is evidenced even a few days ago by a condominium resident making it known in this small Village that I am "the one to blame" for the Defendant Village tax assessment problems with the condominiums in the Village.

28. One of the documents I relied upon in bringing this litigation is the August 9, 2007 Affidavit of Evelyn Picardi who when speaking to Brian Kenney (who handled the assessment for the Defendant Village) was told by him about the tax assessment change for Village condominiums, "you can thank your friend for this assessment change." Ms. Picardi clearly "understood Mr. Kenney was making reference to her next door neighbor, Mr. Louis Terminello." (See, Exhibit "B" annexed hereto).

### THE ACTUAL CHANGE OF ASSESSMENT

29. When accomplishing this retaliatory change in the assessment of condominium units in the Village (including my own), Defendants relied upon a small notice buried in the local newspaper one day only on November 7, 2005. (See, Exhibit "G" to Motion to Dismiss).

7

30. That tiny notice (with such dramatically severe financial consequences for most condominium owners) provided for a public hearing on November 22, 2005 (the evening before Thanksgiving Eve 2005) "to adopt the provisions of Real Property Tax Law, Section 1903, concerning homestead base proportions." (See, Exhibit "G" to Motion to Dismiss).

31. Yet, the Resolution purportedly adopting Section 1903 of the Real Property Tax Law never even mentions that particular section of the Real Property Tax Law in the adopting Resolution. (See, Exhibit "H" annexed to Motion to Dismiss).

32. To the contrary, the Resolution states that the Village determines a need of "adopting a uniform assessment method of all residential real property within the Village, regardless of the form of ownership of such property." (Id.). That is clearly not notice that in this Village some condominiums like Plaintiffs' are to be assessed on the "sales comparison" method and others in the same Village (e.g. Lawrence Park and Roundtree Condominiums) are assessed under the "income method." There is no proper notice and no uniformity in the Defendant Village's actions.

### MUNICIPAL SERVICES ARE NOT PROVIDED TO PLAINTIFFS, BUT VILLAGE TAXES ARE ASSESSED AGAINST PLAINTIFFS FOR THOSE SAME MUNICIPAL SERVICES BEING PROVIDED TO OTHERS IN THE VILLAGE

33. Beginning June 1, 2006 the new set of Village tax bills were mailed out to myself and other condominium unit owners reflecting the retaliatory tax assessment change.

34. Aside from the retaliatory method of assessing certain condominium units (but not all condominium units such as the Lawrence Park and Round Tree Condominium Units), the Village since at least June 1, 2006 has refused to equally provide basic municipal services to the Plaintiffs. More specifically, the Defendant Village denies Plaintiffs certain municipal services,

but <u>compels</u> the Plaintiffs to pay for the municipal services provided to Village single family homes.

35. All condominium owners and all other residential homeowners in the Village pay Village taxes for the following Village services: (1) street sweeping; (2) snow plowing; (3) side walk and curb repairs; (4) street lighting and repairs; (5) storm drain maintenance; (6) fire hydrant water charges and maintenance; (7) street signs; and (8) street repaving and repairs.

36. Beginning at least as of June 1, 2006 the Defendants provided all of the foregoing municipal services to single family home Village residents (and certain others), yet those identical services were <u>not</u> provided to the Plaintiffs as condominiums owners.

37. Otherwise stated, the Plaintiffs are required by the Defendant Village to pay for municipal services only traditional single family homeowners in the Village enjoy. Clearly, Plaintiffs are required to subsidize the single family homeowners in this Village.

38. Therefore, this is yet another example of conduct that Defendants have engaged in against Plaintiffs who have only sought to lower their real estate taxes through the petitioning process in Court. The Defendants now require the Plaintiffs to pay for local municipal services that the Plaintiffs cannot receive.

## <u>NO ISSUES IN THIS LITIGATION INVOLVE THE ASSESSMENTS OF SPECIFIC UNITS IN THE VILLAGE</u>

39. Finally, this Court should know that this litigation does <u>not</u> challenge any individual assessment of any unit regarding its fair market value.

40. The issue regarding a specific fair market value for a specific condominium unit is the subject of a pending tax certiorari litigation filed in New York Supreme Court under Docket Nos. 2617/04 and 2766/05. It was during that litigation that Defendants demanded Plaintiffs

drop their legal action as a condition to not changing the assessment method of valuing their condominium units.

41. This Court should know that the parties have settled the State Court litigations with the Defendant Village agreeing to an approximate 40% reduction in the assessments of all 83 condominium units that I represented, thereby, reducing the assessed value of the 83 condominium units from a total of $16,453,600 to $9,756,000 for the 2004 assessment year and to $9,825,000 for the 2005 assessment year. The settlement is awaiting State Court approval.

42. Accordingly, my belief and that of many others in 2004 and 2005 that the Village was over assessing all 83 condominium units has now been confirmed by the Defendants themselves.

43. This Court should know that these illegal actions by the Village Defendants have continued each and every June 1st of each and every year since 2006 when Village tax bills are sent out. The next injustice will occur on June 1, 2008 and each and every year thereafter until appropriate relief is granted by this Court.

44. For all of these reasons, the Motion to Dismiss should be denied.

WHEREFORE, your Deponent respectfully requests that the Motion to Dismiss be denied; together with such other and further relief as this Court may be just and proper.

_____
LOUIS A. TERMINELLO

Sworn to before me this
15th day of April 2008.

_____
NOTARY PUBLIC

DENNIS E. A. LYNCH
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02LY4979345
QUALIFIED IN ROCKLAND COUNTY
MY COMMISSION EXPIRES MARCH 25, 2011

Case 7:08-cv-01056-WCC   Document 7-2   Filed 04/15/2008   Page 1 of 1

# A New Face In Mayoral Race in Piermont

**Commentary by John Turco**

Lou Terminello is running for mayor in Piermont against the present incumbent mayor, with the election being on March 15. Lou invited me to his place for an interview and showed me the magnificent view of the Hudson. Lou lives upstairs in the former Robert Gair Building, which was converted into a bunch of condominium units. Lou's office is situated downstairs on his home because after he graduated with a Bachelor of Science Degree in Business Administration from Manhattan College in 1974 he went to work as a cost accountant for the Federal Paper Board Company in Piermont. The building housing this condominium was previously one of the Federal Paper Board's.

Lou says that he wants to clarify being an advocate of slope legislation. What he really wants to do is take care of the water runoff and drainage problems in various areas of the village. This includes having the former Erie Railroad right-of-way perennial drainage problems corrected. Water coming down the hillside can potentially besides tourists are already bringing to many homeowners in Piermont to spend dollars and to public streets. He is also aware of the tax stabilization issues in areas that comes out of the sewer pipe that carries sewage from Nyack to Orangeburg. Through Piermont and he has sold ideas on some things he would do to alleviate the situation.

Mr. Terminello says that our property taxes are too high and we must generate more money, but not ate more money, but not through taxes. He says Paradise Board of Marinas and Piermont is the third largest tourist attraction in the county, and is placed right after the Palisades Mall (first) and downtown Nyack (second). Lou thinks there are ways that could be developed so that the village itself would be generating money out of the tourists. After all the valet parking he sees up the roadway, he won this battle, and now Paper Street is still two way.

Lou has good musical ability and has a strong voice and somehow the village sings in the choir of St. John the Baptist. He also serves in St. Paul's Church in Bucharest, Minster. Among his other serving "the people" works, he is a former member of the Nyack Hospital Foundation executive board. He also was on the Conger's Little Landing Homeowner's Association, 227 units, and League Board of Directors, enjoying teaching the children how to play sports. He has complained to me that the Piermont PD Piermont Landing Assoc. have been picking on his promotional signs on the streets the way and harm previous times. They were not predisposed into this, it showed me a court case informing me domain owners trying to get home in favor of some freedom in the United States District Court SDNY in the case of Streets v. ABER Plaintiff (Card) date for town Justice, 1991. The court upheld the signs in the right-of-way and said that the signs were protected by the right of free speech.

There are a lot more things Lou Terminello discussed with me than I could write, but as you all know, Piermont Village Hall.

Lou Terminello New Candidate for Mayor in Piermont. (Marquee)

Election

I have come to the limit of my space for this Friday. Tuesday, March 15 in the Piermont Village Hall.

STATE OF NEW YORK
COUNTY OF ROCKLAND
-----------------------------------------------------------x
LOUIS A. TERMINELLO, MICHAEL MILLER,
PARADISE HOMEOWNERS ASSOCIATION,
HOA OF PIERMONT LANDING, REEDS             AFFIDAVIT
ABBOTTSFORD GATE CONDOMINIUM,
DeVRIES POINT CONDOMINIUM, and
PARADISE HARBOR AT PIERMONT LANDING
CONDOMINIUM,

                          Plaintiffs,

    -against-

THE VILLAGE OF PIERMONT, NEW YORK
by its BOARD OF TRUSTEES AND TRUSTEES,

                          Defendants.
-----------------------------------------------------------x

      **EVELYN PICARDI**, being duly sworn deposes and states under the penalty of perjury as follows:

      1. Your Deponent is a resident of Paradise Harbor at Piermont Landing Condominium. This Affidavit is to provide information regarding an experience I had as a resident of Paradise Harbor.

      2. I called the Village Clerk of the Village of Piermont in January 2006 in order to arrange a meeting to discuss my tax assessment. The Village Clerk took a message.

      3. Mr. Brian Kenney returned my call thereafter and stated that it wasn't necessary for me to appear because Paradise Harbor was being represented by an attorney. I later learned this was untrue.

      4. During the course of our conversation about the tax assessment situation, Mr. Kenney stated that "you can thank your friend for this assessment change." I understood Mr. Kenney was making reference to my next-door neighbor, Mr. Louis Terminello. I

further understood Mr. Kenney to be placing responsibility on Mr. Terminello for the change in assessment of the condominiums at Paradise Harbor that increased the taxes there.

5. This Affidavit is made in awareness that it will be relied upon by the Court in considering all issues in this matter above-captioned.

**WHEREFORE,** your Deponent respectfully requests that the Plaintiffs be awarded appropriate relief; together with such other and further relief as this Court deems just and proper.

_____
EVELYN PICARDI

Sworn to before me this
6th day of August, 2007.

_____
Notary Public

VALERIE A. DRUMMOND
NOTARY PUBLIC, STATE OF NEW YORK
ID No. 01DR6125661
QUALIFIED IN ROCKLAND COUNTY
MY COMMISSION EXPIRES 04/25/2009

- 2 -

**Board of Managers**
**Paradise Harbor at Piermont Landing Condominium**
**55 Harbor Cove**
**Piermont, NY 10968**

March 4, 2001

Village of Piermont
Piermont Ave.
Piermont, NY 10968

To Whom It May Concern:

      The Board of Managers accepts the percentage reduction for the year 2001 on the assessment of real estate properties for Paradise Harbor Condominium (Building 28). This reduction in the assessment is to be no less than 14.13% for each and every occupied unit across the board.

      We are hereby signing off any other tax assessment claim for the year 2001.

Sincerely Yours,

Jack Burke
Board of Managers President

CC: Charles Goldberger, Esq.
      Board of Managers

# TOWN OF ORANGETOWN

**Fax Transmittal Form**

To: Lou Tenerello
Name:
Organization Name/Dept:
CC:
Phone number:
Fax number: 398-3492

From: Brian Kenney
ASSESSOR'S OFFICE

Phone: 845-359-5100 EXT: 265
Fax: 845-359-5114
Email: briankenney46@hotmail.com

Date sent:
Time sent:
Number of pages including cover page:

☐ Urgent
☐ For Review
☐ Please Comment
☐ Please Reply

5/17/01
Signed by
Brian Kenney

221,400

425,700

19.69 of Sale Price

Message:

As requested — the "restricted" assmts are changed on the roll — The [Total] column remains similar to last year except for those units that were completed.

—BK

# TOWN OF ORANGETOWN

## ASSESSOR'S OFFICE
Town Hall · Orangeburg, N.Y. 10962

BRIAN J. KENNEY IAO
Assessor

Telephone
(845) 359-5100
Fax (845) 359-5114

By Fax

Mr. Lou Terminello
Board of Management
Paradise Harbor Condominium
Piermont, New York 10968

February 11, 2003

Re: "Building 28" - 2003 Town Assessment Roll

Mr. Terminello

As previously discussed, this is to inform you that I am proposing that the overall assessments on the individual condominium units in the above property located in the Village of Piermont, NY be adjusted to reflect better equity with other Village properties for the upcoming assessment roll. This adjustment will apply to units 51 through 318 inclusive, & 407 and will result in an assessment reduction of 7%, to be effective for the 2004 Town tax amount in January next and the 2003 School tax amount to be billed in September of this year.

Please note that this will not affect the Village of Piermont or the County assessments on these units as their valuation is already restricted by law (NYS Real Property 339-y) to valuations based not on market but on income. (Please note the differences in valuations on your tax bills).

As discussed, I would appreciate an affirmation from the Board of Management to this proposed adjustment in the name of all the included property owners to be submitted to me in writing. Although individual owners retain the right to challenge assessments at Grievance Day, I reserve the right to withdraw any proposed assessment change for any and all units should this not be accepted by the property owners of the above cited units.

Brian Kenney